IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

<table>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>TERESA PADDY,</td><td>*</td><td></td></tr>
<tr><td>Plaintiff,</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>v.</td><td>*</td><td>CIVIL NO.: WDQ-09-1068</td></tr>
<tr><td></td><td>*</td><td></td></tr>
<tr><td>QUEEN ANNE'S COUNTY BOARD</td><td>*</td><td></td></tr>
<tr><td>OF COUNTY COMMISSIONERS</td><td>*</td><td></td></tr>
<tr><td>Defendant.</td><td>*</td><td></td></tr>
<tr><td></td><td>*</td><td></td></tr>
</table>

*   *   *   *   *   *   *   *   *   *   *   *   *

MEMORANDUM OPINION

Teresa Paddy sued the Queen Anne's County Board of County Commissioners ("the County") for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* For the following reasons, the County's motion for summary judgment will be granted.

I.   Background[1]

In January 2005, Paddy began working for the County as a Recreation Chief in the Department of Parks and Recreation. Teresa Paddy Dep. 20:7-21:2, Dec. 14, 2009. Shortly thereafter,

---

[1] For the purposes of the County's motion for summary judgment, Paddy's "evidence is to be believed, and all justifiable inferences are . . . drawn in h[er] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

1

she was promoted to Enterprise Manager, a job she held until it was eliminated as part of a departmental restructuring in July 2007.  Gregg Todd Dep. 13:15-16:18, Nov. 12, 2009; Steve Davis Dep. 12:1-13:9, Jan. 4, 2010.  As Enterprise Manager, Paddy's responsibilities included preparing budgets, organizing recreation programs, acting as a liaison to county committees and community groups, and managing public marinas and a golf course.  Paddy Dep. 27:6-28:10.  She supervised 10 to 15 full-time employees and 25 to 35 part-time employees.  Todd Dep. 21:4-12.  Her immediate supervisor was Deputy Director of Parks and Recreation, Gregg Todd.  *Id*. 21:18-20.  Her second-line supervisor was the department's director, Steve Davis.  *Id*. 21:21-22:2.

In mid to late 2005, three of Paddy's subordinates complained to Todd that Paddy was frequently out of the office and often unreachable by telephone.  Todd Dep. 52:7-12.  When Todd confronted Paddy about these allegations, she explained that managing the golf course and attending committee meetings required her to be out of the office during regular working hours.  Paddy Dep. 40:2-51:8; Todd 60:3-14.  Paddy's subordinates raised these concerns again with Todd and Davis in late 2006, complaining that Paddy's unavailability had continued and that she often called in sick on Mondays and Fridays.  Davis

Dep. 19:21:12.  Davis met with the subordinates twice.  *Id*. 30:3-

7.  He also investigated Paddy's alleged abuse of sick leave and

discovered that "there was in fact a pattern where she seemed to

be off an awful lot of Mondays and Fridays."  Davis Dep. 28:8-

11.  He directed administrative staff to monitor Paddy's use of

leave and provide monthly reports.  *Id*. 30:20-31:13; 46:13-18.

The reports showed that the "pattern of abuse seemed to

continue."  *Id*. 46:21-47:1.  Todd also informed Davis period-

ically about Paddy's performance.  David Dep. 56:4-9.  His

reports to Davis suggested that although Paddy had shown "a

little bit of improvement," the problems with her performance

had continued.  *Id*. 54:17-56:9.

On January 23, 2007, Paddy received a performance review

for 2006.  Pl.'s Opp., Ex. 14.  The review--which had been

prepared by Todd--noted that:

> Although [Paddy] ha[d] done . . . a good job managing
> the various enterprise accounts under her supervision,
> there [was] still a level of respect and trust missing
> from her relationship with her staff.  [Paddy]
> tend[ed] to miss a number of Fridays and Mondays due
> to illness and this negatively [a]ffect[ed] her
> staff's morale.  [Paddy] ha[d] very good and
> innovative ideas about expanding . . . recreation
> programs, and . . . did an excellent job of
> communicating with County citizens, but that same
> communication skill [was] lacking when dealing with
> her subordinates.

*Id*.  Paddy's performance was evaluated in categories--such as

"establishes goals and objectives"--in which she was scored on a

scale of 1 to 4, 1 being the lowest score. *Id.* Although Paddy

received mostly 3s and 4s, she received 2s in "leadership,"

"team and personnel development," "interpersonal skills," and

other categories that related to her management skills. *Id.* In

an area for employee comments, Paddy wrote that she would

"continue to work on improving [her] relations with subordinates

and reduce call-ins." *Id.*

In February or March of 2007, Paddy's subordinates again

complained to Todd about her frequent absence from the office.

Todd Dep. 66:7-11. Todd met with Paddy on March 28, 2007 to

discuss the problem. *See* Pl.'s Opp., Ex. 8 [Disciplinary Report

prepared by Gregg Todd, Apr. 16, 2007]. In an April 16, 2007

Disciplinary Report, Todd described the meeting:

> On Wednesday, March 28, Ms. Paddy was called into my
> office to discuss her frequent tardiness and lack of
> availability to staff. Ms. Paddy had been verbally
> counseled before on this issue, and it was discussed
> at the meeting on the 28th that in the future, she
> needed to be in the office by 8:00 and spend a minimum
> of 30 hours per week in the office.

*Id.* Later that day, Paddy asked two of her subordinates, "who

[had been] talking bad about [her]?" Pl.'s Opp., Ex. 12 (Email

from Curtis Blouch to Gregg Todd, Mar. 30, 2007). She explained

to them that she had been "called into [Todd's] office again

[that] morning, so someone must have been talking bad about

[her] again." *Id.* She also complained about Todd's requiring

4

her to be in the office for a fixed number of hours.  *Id*.  One
of the employees Paddy confronted, Curtis Blouch, reported the
confrontation to Todd on March 30, 2007.  *Id*.

On April 5, 2007, Todd received a complaint about Paddy
from Terry O'Mara, a dance instructor in a recreation program
Paddy supervised.  Pl.'s Opp., Ex. 8; Todd Dep. 46:8-13, 46:20-
48:8.  O'Mara had approached Paddy about a problem she had with
the room where she taught her class.  *Id*.  O'Mara described
Paddy's response as rude and dismissive.  *Id*.  Paddy had told
O'Mara that one of her subordinates was responsible for the
problem and that O'Mara should contact her.  Pl.'s Opp., Ex. 8.

Around this time, a committee on which Paddy had served
since the beginning of her tenure--the Queen Anne's Sports
Committee--was reconstituted as the Queen Anne's Sports Complex
Committee, which was devoted to researching the construction of
an indoor sports facility.  Paddy Dep. 51:9-52:8.  According to
Todd, Davis decided not to include Paddy in the new committee
because he was "concerned about her performance" and "felt that
she had too many other projects" at the time.  Todd Dep. 24:2-
25:3.

On April 10, 2007, the annual Maryland Recreation and Parks
Association Annual Golf Tournament was held in Ocean City.  Todd
Dep. 37:2-7.  Todd played in the tournament every year, and, in

the past, had played with Paddy's male predecessors. Paddy Dep. 78:21-79:19. Paddy assumed that after she became Enterprise Manager, Todd would invite her to play with him in the tournament. *Id*. 79:11-15. But Todd continued to play with Paddy's predecessors after they had left the department and, in 2007, invited two of Paddy's male subordinates to join his group. Todd Dep. 38:20-41:9. When Paddy asked Todd to play with his group, he told her that if he allowed her to do so, "he would have to bring his wife to play." Id. 79:15-17.[2] Paddy described her exclusion from Todd's group as "kind of embar-rassing for me a female professional because here I was working with [Todd], and my subordinates were playing golf with him . . . . All the other females that played [in the tournament] were on teams with their bosses and co-workers." *Id*. 78:8-20.

A few days after the golf tournament, Paddy told Davis that she believed Todd was discriminating against her because she was a woman. Paddy Dep. 83:2-84:2, 142:3-143:3; Teresa Paddy Aff. ¶ 1, Feb. 18, 2010. She cited Todd's imposition of the 30 hour in-office requirement--which she considered unreasonable because

_____

[2] In his deposition, Todd explained that years before, his wife had played with him in the tournament, but in recent years "it had become an opportunity for four of us gentlemen to get together and play golf." Todd Dep. 38:9-18.

of her many responsibilities outside the office[3]--and his close
relationship with her male co-workers[4] that had led to Paddy's
exclusion from departmental activities like Todd's group at the
golf tournament.  Paddy Dep. 83:9-84:2; Paddy Aff. ¶ 2.[5]  Davis
told Paddy that Todd was "a bit of a chauvinist."  Paddy Dep.
82:13-17.  Paddy asked Davis to schedule a meeting with her and
Todd so that they could "resolve the issue, because [she] really
didn't want to make a complaint."  *Id*. 83:17-20.

---

[3] Paddy believed the requirement was unreasonable "because [her]
job obligated [her] to attend various meetings outside the
office, some taking as much as 10 to 20 hours of [her] time per
week.  [She] was also required to take sufficient time to be on
site to supervise Queen Anne's County facilities spread . . .
throughout the County," including the marinas and the golf
course.  *See* Paddy Aff. ¶ 2.

[4] Paddy "felt like Todd spent a lot more time" with Parks
Supervisor Gary Rzpecki--whom Paddy considered her "equal"--and
her subordinates.  Paddy Dep. 60:9-19.

[5] Paddy's affidavit states that "[o]n or about *May or June 200*7
[she] had undertaken extensive research and analysis for the
Blue Heron Golf Course with regard to possible expansion and/or
reorganization, but . . . . *[s]hortly thereafter*, [she] was
excluded from the planning and bidding process to subcontract
the maintenance of the [course], despite my knowledge and
expertise."  Paddy Aff. ¶ 3 (emphasis added).  Paddy's complaint
and her opposition to the County's motion for summary judgment
also allege that she was excluded from the process in June 2007.
Compl. ¶¶ 21-22; Pl.'s Opp. 6.  This is consistent with other
evidence in the record that the exclusion occurred in June 2007.
*See* Todd Dep. 90:3-11.  Her statement that she complained to
Davis in April 2007 about "being excluded from the bidding of
the Blue Heron Golf Course contract," Paddy Aff. ¶ 2, appears to
be an error.

On April 16, 2007, Paddy met with Davis and Todd, but they did not discuss her complaint about gender discrimination. *Id.* 84:3-4. Instead, Davis and Todd gave her a written reprimand for (1) confronting her subordinates about their complaints about her absence from the office and (2) mistreating O'Mara. Pl.'s Opp., Ex. 8. The reprimand reiterated Todd's 30 hour in-office requirement--which he had imposed on March 28[6]--and directed Paddy "to improve her treatment of staff and to show them . . . respect." *Id.*

In May and June 2007, Paddy performed research and analysis for the expansion and reorganization of the Blue Heron Golf Course. Paddy Aff. ¶ 20. Around that time, Davis had assembled a "focus group" of golfers to address some of the issues Paddy was researching. Davis Dep. 92:10-21. Davis did not include Paddy in the group's meetings because "some of the members had personal problems with . . . Paddy's [management of the course]." Davis Dep. 92:10-93:20.

In June or July 2007, the County directed Davis to elimi-nate the Deputy Director position held by Todd. Davis Dep. 48:3-21. The elimination of the position left a "big gap" in the department's structure, *id.* 52:9, and Davis--in consultation

---

[6] *See* Pl.'s Opp., Exs. 8, 12.

with Todd and Human Resources Director Beverly Churchill[7]--
decided to restructure the department and allocate the Deputy
Director's responsibilities across different positions, *id.*
52:11-20.  On July 10, 2007, Davis recommended that certain
positions--including Paddy's--be eliminated, that several new
positions be created, and that the responsibilities of certain
positions be increased.  Pl.'s Opp., Ex. 10 (Restructuring
Recommendation from Department of Parks and Recreation to Queen
Anne's County Board of Commissioners, July 10, 2007).  Four
members of the department--two men and two women--were assigned
additional responsibilities, and given raises, promotions,
and/or new job titles.[8]

Davis also recommended that a new position, Recreation
Manager, be created. Pl.'s Opp., Ex. 10.  But unlike the other

---

[7] *See* Todd Dep. 97:2-17; Beverly Churchill Dep. 22:11-17, Jan. 4,
2010.

[8] Gary Rzpecki--whom Paddy considered her "equal" in responsibil-
ity before the restructuring--was given an eight percent raise
and promoted from Park Superintendent to Chief of Parks
Operations, a position that included responsibilities formerly
performed by the Deputy Director (Todd) and the Enterprise
Manager (Paddy). Churchill Dep. 44:18-45:13; Pl.'s Opp., Ex. 10.
Robert "Mike" Watson--previously one of Paddy's subordinates--
was given a five percent raise and promoted to Parks Maintenance
Manager, which included many of Rzpecki's former duties.  *Id.*
Nancy Scozzari, a landscape architect, was given a five percent
raise, additional duties, and a new title: Chief Architect and
Planner.  *Id.*  Jennifer Allari, an office assistant, was given a
six percent raise, additional duties, and a new title: Office
Financial Coordinator.  *Id.*

positions described in the Restructuring Recommendation, Davis
did not recommend that Recreation Manager be filled by a current
departmental employee.  Pl.'s Opp., Ex. 10.  Although the
position included some of the duties Paddy performed as
Enterprise Manager, *see id.*; Paddy Dep. 27:6-28:10, and Paddy
was qualified for the position, *see* Churchill Dep. 49:13-15,
Davis decided not to transfer Paddy into the job because he had
concerns about her "performance deficiencies," Davis Dep. 53:10-
15; Churchill Dep. 49:16-21.[9]  Davis encouraged Paddy to apply
for the position, but because of his concerns about her past
performance, Davis decided to advertise the position and
interview other candidates.  Davis Dep. 62:10-64:5.

On July 12, 2007, Paddy was notified that her position was
to be eliminated on July 24, 2007.  Pl.'s Opp., Ex. 9.  On July
14, 2007, Paddy emailed Churchill to ask when the Recreation
Manager position would be posted.  *Id.*, Ex. 15.  Churchill did
not respond.  Paddy Aff. ¶ 22.  The position was posted in
August 2007, but Paddy did not apply because she was not aware

---

[9] Davis decided to recommend the elimination of Paddy's position
and not to transfer Paddy to a different one.  Although he
consulted with Todd and Churchill, they were mere "sounding
boards" for his ideas. *See* Davis Dep. 62:10-15; Churchill Dep.
22:11-13; Todd Dep. 154:1-6.

of the posting.[10]  Paddy Dep. 139:18-140:1.  Davis hired Sharon

Ellis, a woman with at least as much experience in the field as

Paddy.  Churchill Dep. 77:10-78:4.

On April 27, 2009, Paddy filed this complaint, alleging

gender discrimination and retaliation in violation of Title VII.

Paper No. 1.  On January 15, 2010, the County moved for summary

judgment. Paper No. 18.

II.  Analysis

A.  Standard of Review

Under Rule 56(c), summary judgment "should be rendered if

the pleadings, the discovery and disclosure materials on file,

and any affidavits show that there is no genuine dispute as to

any material fact and that the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(c).  In considering a

motion for summary judgment, "the judge's function is not . . .

to weigh the evidence and determine the truth of the matter but

to determine whether there is a genuine issue for trial."

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  A

---

[10]  In her affidavit, Paddy states that she did not apply because
the job was posted and filled while she was on vacation.  Paddy
Aff. ¶ 9.  The affidavit also states that she had submitted a
leave slip to Todd in June or July 2007 informing him of her
plans to take a vacation in August.  *Id*. ¶ 4.  But when asked in
her deposition why she did not apply, Paddy stated that the job
was not posted in the Maryland Recreation and Parks Bulletin
and, therefore, she did not know about it.  Paddy Dep. 139:18-
140:1.

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

The Court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in h[is] favor," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the Court also "must abide by the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial," *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).

B.  Sex Discrimination Under Title VII

Paddy alleges that the County's decision to eliminate her position and not reassign her to the Recreation Manager position was based on her gender.  Under Title VII, it is unlawful "for an employer to . . . discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  To prove a Title VII violation by circumstantial evidence,[11] Paddy must proceed under the three-

---

[11] A plaintiff may rely upon direct or circumstantial evidence to prove a Title VII claim.  *Hill v. Lockheed Martin Logistics, Mgmt., Inc.*, 354 F.3d 277, 287 (4th Cir. 2004). Paddy relies solely on circumstantial evidence.

step scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), most recently refined in *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) and *Williams v. Giant Food, Inc.*, 370 F.3d 423, 430 (4th Cir. 2004).

First, Paddy must show a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Williams*, 370 F.3d at 430. If she does, the Country must present a legitimate, nondiscriminatory reason for its adverse employment action. *Reeves*, 530 U.S. at 142. Then the burden shifts back to Paddy to show that the proffered reason is pretext for gender discrimination. *Id.* at 143.

1. *Prima Facie* Case[12]

A plaintiff can establish a *prima facie* case of discriminatory discharge under Title VII by showing: (1) she is a

---

[12] The parties disagree about what Paddy must show to prove a *prima facie* case. The County argues that because Paddy's job was eliminated in a departmental restructuring, the applicable standard is the "modified" analysis that applies in "reduction in force" ("RIF") cases. *See Jordan v. Radiology Imaging Assocs.*, 577 F. Supp. 2d 771, 782-83 (D. Md. 2008). Paddy argues that she was "effectively" discharged because unlike the other Parks department employees whose jobs were eliminated, she was not assigned to a new position. Pl.'s Opp. 17. Thus, she argues that the applicable standard is the one that applies in discriminatory discharge cases. *See id.* 15-17. As *Jordan* explained, the RIF standard applies "when the decision to terminate an employee is part of a RIF, *and not based on the employee's job performance*." *Jordan*, 577 F. Supp. 2d at 783 (emphasis added). Because there is evidence that Paddy was terminated at least in part based on her performance, the Court will apply the discriminatory discharge standard.

member of a protected class; (2) she suffered an adverse employment action; (3) when the employer took the adverse employment action, she was performing at a level that met its employer's legitimate expectations; and (4) the position was filled by a similarly qualified applicant outside the protected class or other employees who are not members of the protected class were retained under apparently similar circumstances. *See Honor v. Booz-Allen & Hamilton, Inc*., 383 F.3d 180, 188 (4th Cir. 2004).

It is undisputed that Paddy has established the first two elements of the *prima facie* case: she is a member of a protected class and was terminated. As to the third element, Paddy notes that her January 23, 2007 performance review, Pl.'s Opp. 14, indicated she "exceed[ed]" or "consistently exceed[ed]" her employer's expectations in most of the areas in which she was evaluated. She received a total score of 78 out of 100, which qualified her for a four percent raise. *See id*. The County relies on the testimony of Davis, Churchill, and Todd, who described Paddy's ongoing performance deficiencies that ultimately led Davis not to transfer Paddy to the Recreation Manager position.

The parties also dispute whether Paddy has shown the fourth element. Because the County hired Sharon Ellis--a woman with

14

qualifications similar to Paddy's--Paddy must show that "employees who are not members of the protected class were retained under apparently similar circumstances." *Honor*, 383 F.3d at 188. Paddy contends that the County's transfer of Rzpecki and Watson to new positions during the restructuring is sufficient to satisfy this element. The County argues that Rzpecki and Watson were not "retained under similar circumstances" because there were no questions about their ability to perform their new jobs.

The Fourth Circuit has noted that establishing a *prima facie* case is "relatively easy." *See Young v. Lehman*, 748 F.2d 194, 197 (4th Cir. 1984). Although the sufficiency of Paddy's evidence on the third and fourth elements is arguable, the Court will assume that she has made out a *prima facie* case.

2. The County's Nondiscriminatory Reason for Paddy's Termination and Paddy's Evidence of Pretext

The County maintains that its decision not to give Paddy a different job after hers was eliminated was based on concerns about her frequent absences, unavailability to staff, and the mistreatment of staff and dance instructor O'Mara. Although Paddy's opposition memorandum implies that these concerns were unfounded, *see* Pl.'s Opp. 4, there is no evidence in the record that rebuts the County's evidence of Paddy's absences and the incidents with her staff and O'Mara. Paddy explained her

unavailability to her staff was the result of her frequent meetings outside the office and the poor cell phone reception at the Blue Heron Golf Course, where she oversaw operations.

Issues with her performance notwithstanding, Paddy claims that the real reason for her termination was her gender. She relies primarily on Todd's comment that if Paddy were to join his golf foursome, he would "have to bring his wife to play," Todd Dep. 79:15-17, and Davis's description of Todd as a "bit of a chauvinist," Paddy Dep. 82:13-17. She also cites Todd's closer relationship with--and greater "availability" to--her male coworkers. Based on this evidence of Todd's gender bias, she argues that (1) his requirement that she be in the office 30 hours per week, (2) the written reprimand, and (3) her mediocre performance review must also have been based on her gender and not problems with her performance. Finally, she appears to argue this "pattern" of discrimination suggests that her termination was also the result of Todd's gender bias.

There are problems with Paddy's theory. First, there is no evidence that Todd was responsible for Paddy's termination. Although Paddy need not show that Todd was the "formal decision-maker"--*i.e.*, the person or entity that made the ultimate decision to terminate her--she must "present[] sufficient evidence to establish that [Todd] was the one 'principally responsible'

for, or the 'actual decisionmaker' behind, the [termination]."
*Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 288-89
(4th Cir. 2004) (*quoting Reeves*, 530 U.S. at 151-52).  Here, it
is undisputed that the "formal decisionmaker"--with regard to
the decision to eliminate Paddy's job and not to offer her a
different one--was the County.  Equally clear is that the County
acted on Davis's recommendation; as Davis, Todd and Churchill
testified, although Todd was consulted about the restructuring
and about Paddy, Davis was the actual decisionmaker.[13]

Paddy has also failed to produce evidence that her gender
played a role in the decision to terminate her.  "[T]he ultimate
question in every employment discrimination case involving a
claim of disparate treatment is whether the plaintiff was a
victim of intentional discrimination."  *Hill*, 354 F.3d at 286.
Paddy must provide evidence that her gender "actually played a
role in [the County's] decisionmaking process and had a deter-
minative influence on the outcome."  *Id*.  There is no evidence
that Paddy's gender was a factor--let alone "the determinative
influence"--in Davis's recommendation that she be terminated.

---

[13] *See* Davis Dep. 62:10-15 ("Q: But the decision to eliminate the
position that Teresa Paddy held and not offer her a new position
was your decision? A.: In conjunction with Ms. Churchill.  Q:
But it was your decision? A: Yes."); Churchill Dep. 22:11-13
("[I]t was ultimately a recommendation from Steve Davis to the
county commissioners.  And Steve was using [Todd] and I really
as sounding boards."); Todd Dep. 154:1-6.

Nothing in the records rebuts the County's explanation that Paddy was terminated because of poor performance.

Paddy argues that Davis's recommendation that Gary Rzpecki and Mike Watson be promoted in the restructuring is evidence that the decision to terminate her was discriminatory. But she fails to mention that Davis also recommended that Nancy Scozzari and Jennifer Illari be given new titles, additional responsibilities, and substantial raises. Pl.'s Opp., Ex. 10. She also fails to note that Davis hired for the Recreation Manager job Sharon Ellis, a woman with qualifications similar to hers.

Finally, Paddy argues that the circumstances under which the Recreation Manager job was advertised suggest that the County did not want her to apply for the job. She notes that Todd knew she planned to take a vacation during the first week of August--when the job was advertised--and implies that he arranged this coincidence. But this is mere speculation; Paddy cites no evidence that Todd had a role in deciding when the job would be advertised. Davis testified that the decision about when to post the job was made by human resources, Davis Dep. 65:4-12, and Churchill testified that neither Davis nor Todd told human resources when to advertise the position, Churchill Dep. 60:11-17. Paddy cites nothing to the contrary.

Paddy has failed to provide evidence that would permit a jury to find that she was discriminated against because of her gender. Accordingly, the County's motion for summary judgment on Count One will be granted.

C. Retaliation under Title VII

Paddy also alleges that the April 16, 2007 reprimand and her eventual termination were in retaliation for her April 2007 complaint to Davis that Todd was discriminating against her.[14] To establish a *prima facie* case of retaliation, Paddy must show that (1) she engaged in a protected activity; (2) her employer took an adverse employment action against her; and (3) there was a causal link between the two events. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005). If Paddy can show a *prima facie* case of retaliation, the burden shifts to the County to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id*. at 407. If the County meets this burden, "the presumption of retaliation falls, and [Paddy] bears the ultimate burden of proving that the defendant's non-

---

[14] In her opposition, Paddy also argues that the 30-hour in-office requirement was retaliation for her complaint to Davis. Her affidavit states that the 30 hour requirement was a *basis* for her complaint to Davis. *See* Paddy Aff. ¶ 1. Other evidence shows that Todd imposed the 30-hour requirement at a March 28, 2007 meeting with Paddy, which took place at least a week before the meeting with Davis. *See, e.g.*, Pl.'s Opp., Ex. 8. Because the 30 hour requirement was imposed before the complaint of discrimination, it cannot have been in retaliation for that complaint.

retaliatory reason for the adverse employment action was pretext[]." *See id.*

Although the parties dispute whether Paddy has shown a *prima facie* case, the Court need not decide the issue because it is clear that she has not provided evidence of pretext that would permit a jury to find in her favor. The County's proffered reason for terminating Paddy is Davis's concern about her performance. Paddy argues that the temporal proximity of the complaint and her termination and an "intervening pattern of retaliatory conduct" suggest that the reason is pretext for retaliation.

As noted above, the County has provided evidence of Paddy's performance deficiencies--including frequent absences and discourteous treatment of subordinates and others affiliated with her department. Although Paddy implies in her opposition that the evidence about her performance is inaccurate, nothing in the record contradicts it. For example, Paddy contends that the April 16, 2007 reprimand is evidence of intervening retaliatory conduct, which in some cases may support an inference that a subsequent employment action was retaliatory. But she cites no evidence that the stated bases for the reprimand were false. Nor is there any other evidence that the reprimand was related to her complaint. Paddy's performance deficiencies--and Davis's

concerns about them--were documented before her complaint.
Although the April 16, 2007 reprimand appears to be the first
time she had been formally disciplined, it was not the first
time her supervisors confronted her about her performance. Todd
had spoken to her about her frequent absences only a few weeks
before her meeting with Davis, and Davis had been closely
monitoring her performance for nearly a year. The reprimand was
merely the most recent step in the County's attempt to address
longstanding performance problems. Finally, there is no
evidence that Paddy's complaint was considered in making the
decision to terminate her. The complaint was not discussed in
the meeting when the restructuring decisions were made,[15] and
there is no evidence that it was otherwise considered.

The County's stated reason for terminating Paddy is
consistent with the unrebutted evidence of her performance
deficiencies, and Paddy has no evidence that the reason is
pretext for retaliation. Accordingly, the County's motion for
summary judgment on Count Two will be granted.

---

[15] *See* Churchill Dep. 33:11-14.

III. Conclusion

For the reasons stated above, the County's motion for summary judgment will be granted.


June 4, 2010                    _____/s/_____
Date                           William D. Quarles, Jr.
                               United States District Judge